**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

PAULINA RODRIGUEZ, individually and as
parent and guardian of A.R., and on
behalf of all others similarly situated,

      Plaintiff,

         **v.**

MEAD JOHNSON & COMPANY, LLC,

      Defendant.

---

Case No.:


**CLASS ACTION COMPLAINT**


**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.    This action seeks redress for Plaintiff PAULINE RODRIGUEZ ("Plaintiff") individually and as parent and guardian of A.R., for physical illness and financial injury arising from the purchase and consumption of contaminated Enfamil® Infant Formula ("Enfamil" or the "Product").

2.    This action also seeks redress for Plaintiff Rodriguez individually and on behalf of all others similarly situated for deceptive acts and practices in connection with the marketing, advertising, and sale of Enfamil.

3.    Enfamil is manufactured by MEAD JOHNSON & COMPANY, LLC ("Mead Johnson" or "Defendant").  As a result of Defendant's negligent manufacturing process, Defendant's Product was contaminated by disease-carrying insects and was unfit for human consumption, causing Plaintiff and Class members financial injury and causing the hospitalization of A.R., Plaintiff's infant daughter.

4.    Accordingly, Plaintiff Paulina Rodriguez hereby brings this Complaint against Defendant, alleging the following violations: (1) violations of New York General Business Law ("N.Y. G.B.L.") § 349 and § 350 (2) breach of implied warranty of merchantability, (3) strict products liability, (4) negligence, and (5) fraudulent misrepresentation.  Plaintiff and Class members seek compensation for damages they incurred and continue to incur as a direct and proximate result of Defendant's acts and omissions.

5.    The allegations in this Complaint are based on the personal knowledge of Plaintiff as to herself, and on information and belief as to all other matters.

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (a)(2)(A) because Plaintiff and Defendant are of diverse citizenship and the matter in controversy exceeds seventy-five thousand dollars ($75,000.00) exclusive of interest and costs.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B) whereby: (i) the proposed class consists of over 100 class members, (ii) a member of the putative class is a citizen of a different state than Defendants, and (iii) the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs.

8.      The Court has personal jurisdiction over Defendant because the Product is advertised, marketed, distributed, and sold throughout New York State; Defendant engaged in the wrongdoing alleged in this Complaint throughout the United States, including in New York State; Defendant is authorized to do business in New York State; and Defendant has sufficient minimum contacts with New York and/or otherwise has intentionally availed itself of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant's activity within New York State is substantial and not isolated.

9.      At all relevant times hereto, Defendant was a foreign corporation duly authorized to conduct business in the State of New York.  At all relevant times hereto, Defendant was a non-domiciliary of the State of New York and has committed a tortious act outside the State of New York, causing injury to a person within the State of New York that Defendant should reasonably have foreseen.

10.     Pursuant to 28 U.S.C. § 1391(b)(2), this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Plaintiff is a citizen of New York.  She resides in this District and purchased the Product in this District. Moreover, Defendant manufactured, distributed, advertised, and sold the Product in this District.

**PARTIES**

*Plaintiff*

11.     Plaintiff Paulina Rodriguez is, and at all times relevant hereto has been, a citizen of the State of New York and a resident of Kings County. In December 2016, Plaintiff fed her infant daughter A.R. Enfamil that she later discovered had been contaminated by an insect.  Very soon thereafter, A.R. became gravely ill and was hospitalized twice. Plaintiff has also discovered insects in other cans of Enfamil on other occasions.   Below is a picture of the first insect discovered by Plaintiff and an image of the can in which another insect was later found:





*Defendant*

12.    Defendant Mead Johnson & Company, LLC is a global child and infant nutrition company headquartered at 2701 Patriot Boulevard, Fourth Floor, Glenview IL 60026.   Its registered agent address for service of process is Corporations Service Company, 80 State Street, Albany, NY 12207-2543.

<u>**FACTUAL ALLEGATIONS**</u>

<u>**Background: Mead Johnson's Culture of Reckless Indifference to Infant Health and Safety**</u>

13.    On February 9, 2017, Ms. Linda O'Risky filed a whistleblower complaint against her former employer, Mead Johnson, alleging that she had been terminated from her position as

Global Product Compliance Director in retaliation for her escalating concerns about safety issues related to the manufacture of Mead Johnson's infant formula. *O'Risky v. Mead Johnson Nutrition Co*., United States District Court for the Northern District of Illinois, Case: 1:17-cv-01046, Doc. #1 ("O'Risky Compl.").

14.    Ms. O'Risky has a degree in chemical engineering and was a 25-year veteran of Mead Johnson, where she occupied a number of leadership roles, including in quality and compliance. O'Risky Compl. ¶¶ 18-19

15.    The immediate cause of Mead Johsnson's retaliation against Ms. O'Risky was her escalating concerns about the safety of its "ready-to-use" liquid infant formula rather than the powdered formula at issue in this case. But her whistleblower complaint draws a disturbing picture of Defendant's culture of reckless indifference to the safety and purity of all its infant products. For example, Ms. O'Risky notes that a Senior Vice President at Mead Johnson "opposed [her] intention to hold back batches of Gentlease based on the presence of insects in certain samples" and "maintained that insects were not a food safety issue, and that Ms. O'Risky had overreacted." O'Risky Compl. ¶ 21.

16.    From 2013 on, Ms. O'Risky "facilitated the corporate Quality Council, a multidisciplinary group charged with overseeing quality issues and setting policies and best practices." O'Risky Compl. ¶ 24. However, the Quality Council's budget was soon thereafter cut and promised support positions went unfilled. Once a Mr. Jobe joined the Quality Council, "the group began meeting less frequently and discontinued tracking corrective actions." Ms. O'Risky raised a number of concerns in Quality Council meetings, including concerns about "deficiencies in environmental contamination controls," but "Mr. Jobe was extremely defensive

and often told her that she was overstepping her bounds by raising specific quality issues in Quality Council meetings." O'Risky Compl. ¶ 25.

17.    Later in 2015, Ms. O'Risky reported to Mead Johnson's Integrity Concern compliance hotline that she had "serious concerns" about product safety, Mead Johnson's failure to adhere to its legal and regulatory obligations, and an organizational structure that created a conflict of interest and stifled any meaningful remedial action." She noted that the Vice President of General Quality Assurance would "intimidate subordinates in Quality and Internal Audit roles into not reporting the true severity of a defective product or process" and that "the performance objectives for Quality personnel included reducing the number of product write-offs and market actions (e.g., recalls and withdrawals), which clearly incentivized these employees to downplay risks rather than objectively assessing them." Ms. O'Risky had been instructed "to consider only reports of death and serious illness from Health Care Professionals as credible and to consider all other consumer complaints . . . as not credible." She was also instructed "to determine if there [was] an opportunity to be less complaint [sic] with the applicable [FDA reporting] laws." O'Risky Compl. ¶ 37.

18.    Others at Mead Johnson agreed with Ms. O'Risky's assessment of the company's general culture and priorities. One Ms. Zerm, who responded to Ms. O'Risky's Integrity Concern complaint, "expressed concern about the Supply Chain's apparently common practice of continuing to release into the market goods that were potentially implicated in non-conformity investigations." O'Risky Compl. ¶ 54. This was precisely what precipitated Ms. O'Risky's escalating concerns about Mead Johnson's ready-to-use infant formula, for which she was eventually terminated.

19.    Defendant's culture of reckless indifference to infant health and safety has not been without consequences.    Over the years, consumers have complained about insect infestations in their Enfamil, sometimes making these complaints public.

20.    In 2010, a consumer complained as follows:



https://community.babycenter.com/post/a24908763/found_a_live_bug_in_enfamil
(viewed 03.10.2017)

7

21.    In 2015, another consumer complained:



**BUG IN FORMULA**

Kristen1187
20/12/15

I was cleaning my babies bottle after just feeding him his Enfamil A+ formula and I found some sort of bug in his bottle!!! I am completely disgusted I just wanna cry that I fed him that !!! We mostly breast feed but feed him the odd formula ! I will attach a photo!

http://www.babycenter.ca/thread/2270059/bug-in-formula (viewed 03.10.2017)

22.    In 2016, one Missouri mother found a maggot in Defendant's Nutramigen line of infant formula:





http://cw33.com/2016/10/12/maggot-like-worms-found-in-baby-formula/

9

23.     As recently as February 2017, the following video was posted on YouTube:



[https://www.youtube.com/watch?v=eB_E_5qGO9U](https://www.youtube.com/watch?v=eB_E_5qGO9U) (viewed 03.10.2017)

**Plaintiff Rodriguez's Story: The Consequences of Defendant's Reckless Indifference**

24.     The consequences of Defendant's culture of reckless indifference to infant health and safety would be grave for A.R., the then ten-month old infant daughter of Plaintiff Paulina Rodriguez.  While the Defendant's Vice President for Quality maintained that "insects were not a food safety issue," Plaintiff Rodriguez's experience would prove him very, very wrong.

25.     Ms. Rodriguez is a resident of Brooklyn, New York, and had been feeding Enfamil to A.R. since shortly after her birth, starting in April 2016.  During this period, Ms.

Rodriguez alternated between purchasing cans of Enfamil Infant Formula Stage I at a Key Foods in Brooklyn and a Stop 'n Shop in Queens.

26.     On November 24, 2016—Thanksgiving Day—Ms. Rodriguez was shocked and horrified to discover the presence of a red insect in the Enfamil she had purchased.  *See* **Exhibit A**.  The incident was witnessed by a number of individuals, as it transpired at a holiday gathering, and a video recording was taken.

27.     On November 28, 2016 Ms. Rodriguez called and related the incident to Mead Johnson, which responded with two free cans of formula and coupons.  As per Defendant's request, Ms. Rodriguez sent the can in which the insect was found to Mead Johnson for testing. *See* **Exhibit B**.

28.     Since Ms. Rodriguez had by this point been using Enfamil for many months without incident, she assumed that the can with the insect was anomalous, a mere fluke of chance, and so continued to use Enfamil.

29.     This reasonable assumptions would prove mistaken, however.  Less than a month later, sometime between December 18 and December 21, 2016, Ms. Rodriguez again discovered that the Enfamil formula she had been feeding her daughter was housing yet another insect.

30.     This second discovery of an insect coincided with a deterioration in A.R.'s health. On December 20, 2016 A.R. became gravely ill, and the following day she was taken to a local clinic, where she registered a fever of 103.  The physician diagnosed her with a stomach virus and prescribed Motrin.   A.R.'s deterioration then accelerated, as she began to suffer from continuous vomiting and diarrhea.   On December 23, 2016, Ms. Rodriguez took her to the emergency room at Long Island Jewish Hospital, where she required medication already in the waiting room before being formally admitted.  A.R. registered a fever of 100 and was diagnosed

with a urinary track infection.  *See* **Exhibit C**.  The doctors had to use a catheter to obtain a urine sample and then hooked A.R. up to a cannula in order to administer antibiotics intravenously. A physician then prescribed her more antibiotics.

31.     The next three days saw no improvement.  Not only did the vomiting and diarrhea persist, A.R. also became listless and indeed looked barely alive.  Fungus appeared on her behind and white sores appeared on her mouth.  *See* **Exhibit D**. A.R. was being fed very little of anything at this point, as she could barely eat.  On December 26, 2016, she was again taken to the local clinic, where she was prescribed medication for the fungus and sores.  Ms. Rodriguez was told to return to the hospital if she saw no improvement.

32.     She saw none, and on December 27, 2016, Ms. Rodriguez took A.R. to Jamaica Hospital, *see* **Exhibit E**, where she was found to have an accelerated heart rate and was given medicine to stop her vomiting. The physicians wanted to insert a catheter, but Ms. Rodriguez refused given the excruciating pain this had caused A.R. during her prior visit to Long Island Jewish Hospital.  By December 30, 2016, A.R. was beginning to recover, though she was still suffering from bouts of diarrhea and vomiting.  A.R. had been completely healthy until these events and required no contact with physicians aside from routine check-ups.

33.     While A.R.'s illness subsided, Ms. Rodriguez's discovery of contaminants in Enfamil did not.  On January 1, 2017, Ms. Rodriguez was about to feed A.R. only to discover another insect in a can of Enfamil opened that very day, this time dried and flattened.  *See* **Exhibit F**.  Ms. Rodriguez promptly stopped using the Enfamil in that can and opened up another.

12

34.     The can of Enfamil opened on January 1 would prove no better than the one it replaced, however.  On January 4, 2017, Ms. Rodriguez arose to feed A.R. at 4:00 a.m. and discovered yet another insect in that can. *See* **Exhibit G**.

35.     By this point, Ms. Rodriguez was detecting a pattern.  And so she called Mead Johnson and urged it to investigate whether the entire shipment sent to her local Key Foods had been contaminated.  She also asked about the lab results on the contaminated Enfamil she returned in November but was told that the laboratory testing department was closed.

**Defendant's Actionable Conduct**

36.     Defendant is in the business of formulating, designing, manufacturing, marketing, advertising, and distributing Enfamil to consumers.  Enfamil is among the top-selling powdered infant formulas on the market and is sold in supermarkets, convenience stories, and pharmacies throughout the United States.

37.     Through its advertising and marketing, Defendant promoted and continues to promote Enfamil as being safe and healthy for infants.  The Product label describes Enfamil as "gentle nutrition tailored for infants" and states that Enfamil "helps support your baby's healthy brain and development."   Defendant's website represented that Enfamil is "tailored to meet the nutritional needs of babies aged 0 through 12 months," that Enfamil "nutrition helps support milestones like grasping and rolling over," and that the formula is "closer to mature breast milk than ever before."[1]

38.     Relying on these or other similar representations, Plaintiff and Class members reasonably believed in the quality and safety of Enfamil and had no reason expect that it carried a risk of adverse health consequences.

---

[1] https://www.enfamil.com/products/enfamil-infant

39.    Plaintiff and Class members were misled into purchasing unsafe Enfamil, which did not provide the attributes and benefits that they reasonably expected to receive and believed they were receiving.  As a result of Defendant's negligent manufacturing process and deceptive acts and practices, Plaintiff and Class members purchased a product that was not safe for consumption and so did not offer the qualities for which it had been advertised.

40.    Defendant was obligated to disclose, but failed to disclose, that its manufacturing process does not take safety issues seriously and that the Product was therefore liable to be contaminated and dangerous.  Defendant believes that "insects [are] not a food safety issues," but at no point did it warn consumers that this was its policy.

41.    Nor did Defendant warn consumers that its top priority was to minimize product recalls and withdrawals and that it incentivized employees to downplay risks and ignore government regulations.

42.    Defendant thus failed to warn purchasers of the unreasonable dangers associated with the Product, including the risk that it is contaminated by disease-carrying insects that are liable to cause serious health problems to vulnerable infants.

43.    Defendant owed a legal duty to Plaintiff and Class members to exercise reasonable care by formulating, manufacturing, marketing, advertising, distributing, and selling products that were safe for human consumption.  Defendant knew or should have known that its failure to ensure reasonable safety standards would permit insects to infiltrate the Product, creating grave dangers for the health of vulnerable infants.

44.    Plaintiff and Class members would not have purchased the Product had they known it was vulnerable to infestation with disease-carrying insects.

45.    Plaintiff and Class members had no way of independently discovering that Defendant's manufacturing process assigned little importance to infant health and safety.

46.    Defendant breached its duty to consumers, which directly and proximately resulted in Plaintiff and other Class members suffering injury in fact, physical injury and suffering, financial injury, the personal expenditure of time and resources, and mental anguish.

47.    Plaintiff and Class members were injured financially because Defendant's negligent and dangerous manufacturing process has reduced the value of the Enfamil they purchased to zero. Since they can no longer be certain of the Product's safety, their purchases are unusable.

48.    Moreover, given Defendant's duty not to expose Plaintiff and Class members to potentially harmful products, Plaintiff and Class members are entitled to the reasonable value of the cost of medically monitoring their infants'/children's condition, since the need for medical monitoring is a predictable consequence of consuming potentially contaminated products.

**A.R. Illness Is Directly Traceable To Defendant's Acts And Omissions**

49.    Defendant's reckless and irresponsible manufacturing process permitted the Enfamil consumed by A.R. to become contaminated by insects.

50.    These insects carried *Chronobacter* (also known as *Enterobacter sakazakii*) or some other dangerous insect-borne pathogen.

51.    This bacteria in turn caused A.R.'s illness and hospitalization.

52.    A.R.'s symptoms were those commonly associated with *Cronobacter*. The Center for Disease Control ("CDC") states that "[s]ickness from *Cronobacter* in babies will usually start with a fever and poor feeding, crying, or very low energy"[2]—precisely A.R.'s

---

[2] https://www.cdc.gov/cronobacter/definition.html

symptoms.  The C.D.C also notes that "*Cronobacter* can also get into your urinary tract."[3]  A.R. was diagnosed with a urinary tract infection.

53.    It is a well-documented scientific fact that *Cronobacter* and similar pathogens can be transmitted through powdered infant formula.  This has been of increasing concern to parents and regulators alike.  Providing a chronology of the bacteria and its scientific study, John J. Framer III—the researcher who first named and described *Enterobacter sakazakii*—observed:

> *2001*: There was an outbreak of *Enterobacter sakazakii* at a Tennessee hospital with one case of meningitis and eight additional cases with *Enterobacter sakazakii* colonization. It was caused when infants were fed Portagen, a commercial powdered formula produced by Mead Johnson. This outbreak marked the beginning of the U. S. Food and Drug Administration's interest in contamination of powdered infant formula products and especially contamination with *Enterobacter sakazakii*.[4]

54.    Defendant was thus at the very origin of the Food and Drug Administration's current concern with contaminated powdered infant formula.  As Farmer further observes, "The powdered infant formula industry still cannot produce powdered formula that is free of bacterial contamination with *Cronobacter*, other *Enterobacteriaceae*, other pathogenic bacteria, and other microorganisms.  Until this happens, infants and other[s] will be at risk of becoming infected when they ingest contaminated formula."[5]

55.    It is also well known that *Cronobacter* and other pathogens can be transmitted through insects.  This is why Framer urges the powdered infant formula industry to "[m]ake a

---

[3] https://www.cdc.gov/cronobacter/definition.html
[4] https://pdfs.semanticscholar.org/9189/1ec490aa44493654c76c7b2a7170444b39b7.pdf; John J. Farmer III, "My 40-year history with *Cronobacter/Enterobacter sakazakii* – lessons learned, myths debunked, and recommendations," in *Frontiers in Pediatrics*, Nov. 2015, Volume 3, Article 84, pg. 3.
[5] https://pdfs.semanticscholar.org/9189/1ec490aa44493654c76c7b2a7170444b39b7.pdf; John J. Farmer III, "My 40-year history with *Cronobacter/Enterobacter sakazakii* – lessons learned, myths debunked, and recommendations," in *Frontiers in Pediatrics*, Nov. 2015, Volume 3, Article 84, pg. 1.

product free of contamination with *Cronobacter*, *Salmonella*, other pathogenic bacteria, other microorganisms, insects, insect parts, or other foreign objects."[6]

56.    Citing a number of studies, Joanne V. Hamilton, Michael J. Lehane, and Henk R. Braig of the University of Wales conclude that "[i]nsects are thus a likely major environmental reservoir of *E. sakazakii*."[7]

57.    The Enfamil purchased by Plaintiff was produced at the Evansville, Indiana facility where Ms. O'Risky was stationed, O'Risky Compl. ¶ 18, and where she observed "a culture and organizational structure that increasingly prioritized profits over safety and compliance." O'Risky Compl. ¶ 2.  Here is the back of one of the cans purchased by Plaintiff:



58.    Ms. O'Risky's assessment is confirmed by other sources.  Farmer advises the powdered infant formula industry:

[6] https://pdfs.semanticscholar.org/9189/1ec490aa44493654c76c7b2a7170444b39b7.pdf; John J. Farmer III, "My 40-year history with *Cronobacter/Enterobacter sakazakii* – lessons learned, myths debunked, and recommendations," in *Frontiers in Pediatrics*, Nov. 2015, Volume 3, Article 84, pg. 10.
[7] https://wwwnc.cdc.gov/eid/article/9/10/pdfs/03-0218.pdf; Joanne V. Hamilton, Michael J. Lehane, and Henk R. Braig, "Isolation of *Enterobacter skazakii* from Midgut of *Stomoxys calcitrans*," in *Emerging Infectious Diseases*, Vol. 9, No. 10, October 2003, pg. 1356.

Do not allow water to accumulate on the roof of the production facility!  This was a documented problem at a Mead Johnson facility that produced powdered formula.  The Structure Tech Compnay stated on its internet site: "Mead Johnson, a division of Bristol-Myers Squibb, was experiencing leakage conditions over their manufacturing operations, some of which were sterile environments."  The internet description above was apparently removed after this… damaging quotation was revealed in a legal case involving the Mead Johnson facility.[8]

59.     While the discovery of one contaminated can of Enfamil might be chalked up to a random accident, Ms. Rodriguez's repeated discovery of <u>four</u> contaminated containers within the span of six weeks betrays Defendant's systematic indifference to the safety and purity of its infant formula.

60.     Like any responsible mother, Ms. Rodriguez was always careful not to leave cans of infant formula opened any longer than was necessary to scoop the powder.  Thus, the contaminants arrived with the cans, not from her home.  Were it otherwise, Ms. Rodriguez would have discovered contaminants during the many months prior to November 24, 2016, when she was already using Enfamil.  But she did not.

61.     The sudden outbreak of a serious, life-threatening bacterial infection in a previously healthy baby during this time period also cannot be chalked up to mere coincidence.  The number of insects discovered by Plaintiff Rodriquez in a short period of time when combined with Defendant's culture of reckless indifference to infant health and safety point to one conclusion: A.R.'s illness and hospitalization are directly attributable to the insects that Defendant believes are "not a food safety issue."

---

[8] https://pdfs.semanticscholar.org/9189/1ec490aa44493654c76c7b2a7170444b39b7.pdf; John J. Farmer III, "My 40-year history with *Cronobacter/Enterobacter sakazakii* – lessons learned, myths debunked, and recommendations," in *Frontiers in Pediatrics*, Nov. 2015, Volume 3, Article 84, pg. 10.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff RODRIGUEZ seeks to represent a class consisting of:

All persons or entities who were exposed to Defendant's representations in New York and purchased the Product in New York during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Class")

63.     The proposed Class excludes current and former officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, Defendant's legal representatives, heirs, successors, assigns, and any entity in which it has or has had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

64.     Plaintiff reserves the right to revise Class definitions based on facts learned in the course of litigating this matter.

65.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through the appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Other members of the Class may be identified from records maintained by Defendant and may be notified of the pendency of this action by mail, or by advertisement, using the form of notice similar to that customarily used in class actions such as this.

66.     Plaintiff's claims are typical of the claims of other Class members as all Class members are similarly affected by Defendant's wrongful conduct.

67.     Plaintiff will fairly and adequately protect the interests of Class members in that Plaintiff has no interests antagonistic to those of the other Class members.  Plaintiff has retained experienced and competent counsel.

68.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for them to individually seek redress for the wrongful conduct alleged herein. If class treatment of these claims were not available, Defendant would likely unfairly receive hundreds of thousands of dollars or more in improper charges.

69.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the common questions of law and fact to the Classes are:

    i.    whether Defendant made misrepresentations and/or deceptive omissions concerning the safety and healthfulness of Enfamil;

    ii.    whether Defendant's marketing, promotion and advertising of the Product is false, fraudulent, deceptive, unlawful or misleading;

    iii.    whether Defendants' marketing, promotion, advertising and sale of the Product is and was a deceptive act or practice in the conduct of business directed at consumers, giving rise to a violation of NY GBL § 349 and § 350;

    iv.    whether Plaintiff and Class members sustained injuries or damages as a result of Defendant's false advertising of the Product;

    v.    whether Plaintiff and Class members are entitled to equitable relief and prospective injunctive relief enjoining Defendant from continuing to engage in the fraudulent, deceitful, unlawful and unfair common scheme as alleged in this Complaint; and

vi.   whether Defendant's conduct rises to the level of reprehensibility under applicable law such that the imposition of punitive damages is necessary and appropriate to fulfill the societal interest in punishment and deterrence, and the amount of such damages and/or their ratio to the actual or potential harm to the Class.

70.    The prosecution of this action as a Class action will reduce the possibility of repetitious litigation. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

71.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual class member are too small to make it economically feasible for an individual class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

72.    The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

73.    The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

74.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. Additionally, individual actions may be dispositive of the interest of all Class members even though certain Class members are not parties to such actions.

75.     Defendant's conduct is generally applicable to the Classes as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Classes as a whole. As such, Defendant's systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

## CAUSES OF ACTION

## COUNT I

### INJUNCTION FOR VIOLATIONS OF NY GBL § 349
### (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)
### (Brought Individually and on Behalf of the Class)

76.     Plaintiff Rodriguez realleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein.

77.     Plaintiff Rodriguez brings this claim individually and on behalf of the Class for an injunction for violations of NY GBL § 349.

78.     NY GBL § 349 provides that deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are unlawful.

79.     Any person who has been injured by reason of any violation of the NY GBL § 349 may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the Defendant willfully or

knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

80.     Defendant misrepresented and omitted material information regarding the Enfamil products by failing to disclose the known risks created by its systematic indifference to insect infestation and other contamination.

81.     Mead Johnson knowingly and falsely represented that Enfamil was fit to be used for the purpose for which it was intended when it knew it was defective and dangerous.

82.     Defendant's misrepresentations and concealment of material facts constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and/or the knowing concealment, suppression, or omission of materials facts with the intent that others rely on such concealment, suppression, or omission in connection with the sale and advertisement of the Enfamil products.

83.     Mead Johnson engaged in the deceptive acts and practices alleged herein in order to sell Enfamil to the public, including Plaintiff and the Class.

84.     Mead Johnson's practices, acts, policies, and course of conduct, including its omissions, as described above, were intended to induce, and did induce, Plaintiff and the Class to purchase Enfamil.

85.     Mead Johnson sold Enfamil knowingly concealing that it contained the defects alleged.

86.     Acts and omissions by Mead Johnson were likely to mislead a reasonable consumer into purchasing Enfamil.  Defendant's deceptive acts and omissions are material because they concern an essential feature of the Product, its safety for vulnerable infants.

87.     The sale and distribution in New York of Enfamil was a consumer-oriented act. and thereby falls under the New York deceptive acts and practices statute.

88.     Mead Johnson has refused to act on grounds generally applicable to the injunctive relief sought by Plaintiff, thereby making final injunctive relief appropriate.

89.     Mead Johnson persists in its deceptive and unfair marketing and sales practices regarding Enfamil to the detriment of consumers across the country, including Plaintiff and the Class.

90.     If Mead Johnson is allowed to continue with these practices, consumers, including Plaintiff and the Class, will be irreparably harmed.  Plaintiff and the Class do not have a plain, adequate, speedy, or complete remedy at law to address all of the wrongs alleged in this Complaint unless injunctive relief is granted to stop Defendant's deceptive marketing and sale of Enfamil.

91.     Plaintiff Rodriguez is therefore entitled to an injunction requiring Mead Johnson to cease its unfair and deceptive practices relating the sale of Enfamil.

92.     Plaintiff Rodriguez seeks a Court Order requiring Mead Johnson to do the following:

    a.  discontinue advertising, marketing, packaging and otherwise representing Enfamil as safe and healthy without providing appropriate warnings and disclosures regarding the risks described herein;

    b.  undertake an immediate public information campaign to inform consumers, of the truth about Enfamil and Defendant's prior practices relating thereto; and

c.  correct any erroneous impression it created concerning the nature, characteristics, or qualities of Enfamil, including without limitation, the placement of corrective advertising and providing written notice to the general public.

## COUNT II

**DAMAGES FOR VIOLATIONS OF NY GBL § 349 and § 350**
**(DECEPTIVE AND UNFAIR TRADE PRACTICES/FALSE ADVERTISING)**
**(Brought Individually and on Behalf of the Class)**

93.  Plaintiff Rodriguez realleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein.

94.  Plaintiff Rodriguez brings this claim for damages under NY GBL § 349 & § 350.

95.  Mead Johnson engaged in consumer-oriented, commercial conduct by selling and advertising Enfamil.

96.  Mead Johnson misrepresented and omitted material information regarding Enfamil by failing to disclose foreseeable risks created by its systematic indifference to insect infestation and other contamination.

97.  Mead Johnson's misrepresentations and concealment of material facts constitute unconscionable commercial practices, deception, fraud, false advertising, misrepresentation, and/or the knowing concealment, suppression, or omission of materials facts with the intent that others rely on such concealment, suppression, or omission in connection with the sale and advertisement of Enfamil, in violation of NY GBL § 349.

98.  Mead Johnson knowingly and falsely represented that Enfamil was fit to be used for the purpose for which it was intended, when Mead Johnson knew it was defective and dangerous.

99.     Mead Johnson engaged in the deceptive acts and practices alleged herein in order to sell Enfamil to the public, including to Plaintiff Rodriguez.

100.     Mead Johnson's practices, acts, policies, and course of conduct, including its omissions, as described above, were intended to induce, and did induce, Plaintiff Rodriguez to purchase Enfamil.

101.     Mead Johnson sold Enfamil knowingly concealing that it contained the defects alleged herein.

102.     As a direct and proximate result of these unconscionable, unfair, and deceptive acts or practices, Plaintiff Rodriguez and the Class were injured when they paid money for a product that did not have the qualities and attributes that Defendant had advertised.

103.     Plaintiff and the Class are therefore entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorney's fees.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Brought on Behalf of Plaintiff Rodriguez Individually)

104.     Plaintiff realleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein.

105.     In "a breach of warranty of merchantability claim, Plaintiff must allege that the product is not fit for the ordinary purposes for which such goods are used." *Gasque v. Thor Motor Coach*, 2017 NY Slip Op 50122(U), ¶ 3 (Sup. Ct.) (citing *Bradley v. Earl B. Feiden, Inc.*, 8 NY3d 265, 273, 864 N.E.2d 600, 832 N.Y.S.2d 470 (2007)).

106.     Mead Johnson impliedly warranted and represented through advertisements, marketing, packaging, labels, websites and other material that Enfamil fit for the ordinary purposes of infant formula—namely, feeding vulnerable infants in a safe and healthy fashion.

107.    Mead Johnson breached said warranty because the Enfamil purchased by Plaintiff was contaminated with disease-carrying insects, causing a bacterial infection that was inconsistent with the ordinary purpose of infant formula.

108.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff purchased unsafe products and her daughter was physically harmed as a result.

109.    As a direct and proximate result of Defendant's breach, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT IV

### STRICT PRODUCTS LIABILITY
**(Manufacturing Defect and Failure to Warn)**
**(Brought on Behalf of Plaintiff Rodriguez Individually)**

110.    Plaintiff realleges and incorporate herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein, and further alleges as follows.

111.    At all times herein mentioned, Mead Johnson designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Enfamil used by Plaintiff.

112.    Enfamil was expected to, and did, reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Mead Johnson.

113.    In order to plead a manufacturing defect a plaintiff must assert that (1) the product was not reasonably safe as marketed; (2) the plaintiff used the product for a normal purpose; (3) by exercising reasonable care, plaintiff would not have discovered the defect and apprehended its

27

danger; and (4) plaintiff would not have otherwise avoided injury by exercising ordinary care. *Derienzo v. Trek Bicycle Corp.*, 376 F.Supp.2d 537, 560 (S.D.N.Y. 2005).

114.    Element #1 is satisfied because Enfamil was not reasonably safe as marketed.  As Ms. O'Risky's Complaint against Mead Johnson reveals, it has been Defendant's longstanding practice to prioritize profits over safety measures, even when this meant ignoring the relevant government regulations.

115.    Element #2 is satisfied because Plaintiff used Enfamil for its normal, intended purpose—feeding infants.

116.    Element #3 is satisfied because Plaintiff could not have discovered the danger of Enfamil through the exercise of reasonable care.  Plaintiff did not have access to the information disclosed in the O'Risky Complaint.  She was not instructed to discontinue using Enfamil or to always examine it for insects when she returned the first contaminated can to Defendant.  While Plaintiff did discover insects, this was always <u>after</u> A.R. had been fed out of the can in question. It was only after multiple such discoveries that Plaintiff could reasonably infer a health and safety problem with the Product.

117.    Element #4 is satisfied because Plaintiff could not have prevented A.R.'s illness through the exercise of ordinary care.  Plaintiff exercised ordinary care by contacting Defendant about the problem and discontinuing the use of any can in which an insect had been found.  Yet this was insufficient to prevent A.R.'s illness.

118.    To establish a *prima facie* case of manufacturing defect, the plaintiff "may rely upon the circumstances of the accident and proof that the product did not perform as intended." *Hare v. Hoveround Corp.,* 2009 WL 3086404, at *4 (N.D.N.Y. September 23, 2009) (citing *Brown v. Borruso,* 238 A.D.2d 884, 885, 660 N.Y.S.2d 780 (4th Dept. 1997)).

28

119.    In combination with the information disclosed in the O'Risky Complaint, the circumstances of A.R.'s illness establish that Enfamil was defectively manufactured—that is, manufactured without the safety precautions appropriate for infant formula.  Insects have been discovered in Enfamil before, and Plaintiff's discovery of four insects within approximately six weeks gives rise to the inference of a systematic problem at Defendant's manufacturing facility.

120.    Defendant failed to warn Plaintiff of this problem even though it knew or had reason to know of it (having been informed of it by Ms. O'Risky).

121.    Defendant had a duty to give adequate warning of the dangers associated with Enfamil, which it knew or should have known existed.

122.    As a direct and proximate result of Defendant's manufacturing process and failure to warn Plaintiff of the dangers created by that process, Plaintiff and her daughter A.R suffered physical illness and/or economic harm.

123.    Defendant's actions and omissions as identified in this Complaint show that Defendant acted maliciously and intentionally disregarded the rights of Plaintiff and A.R., thus warranting the imposition of punitive damages.

## COUNT V

**NEGLIGENCE**
**(Brought on Behalf of Plaintiff Rodriguez Individually)**

124.    Plaintiff realleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein, and further alleges as follows:

125.    At all times material hereto, Mead Johnson designed and manufactured Enfamil.

126.    Mead Johnson had a duty to exercise reasonable care in designing, manufacturing, assembling, marketing, selling and/or distributing the Enfamil. Mead Johnson placed Enfamil

into the stream of commerce.  It had a duty to ensure that the Product would perform as intended and not create serious health risks to Plaintiff.

127.   Mead Johnson failed to exercise ordinary care in the designing, manufacturing, assembling, inspecting, marketing, selling and/or distributing Enfamil into the stream of commerce.  Mead Johnson knew or should have known that Enfamil was manufactured without adequate safety precautions and that this created an unreasonable risk of insect infestation, bacterial contamination, and associated health problems.

128.   The negligence of Mead Johnson, its agents, servants, and/or employees, included, but was not limited to, the following acts and/or omissions:

i.   manufacturing, marketing, and distributing Enfamil without adequately testing it for contaminants;

ii.   failing to warn Plaintiff, the public, and the medical and healthcare profession, of the dangers of Enfamil;

iii.   failing to recall or otherwise notify users at the earliest date that it became known that the Product was dangerous and defective;

iv.   representing that Enfamil was safe for its intended purpose when it is in fact unsafe;

v.   concealing information reported by its own employee(s) that its manufacturing practices did not conform to accepted industry and regulatory standards.

129.   Mead Johnson knew or should have known that consumers such as Plaintiff would suffer foreseeable injury, both physical and economic, and/or be at an increased risk of suffering injury as a result of Mead Johnson's failure to exercise ordinary care.  *See* ¶ 17.

130.   Mead Johnson's actions and omissions constitute negligence per se by virtue of violating statutes, ordinances and/or rules and/or regulations.

131.    Mead Johnson's negligence was the proximate cause of A.R.'s illness.

132.    Defendant's conduct as described herein, including but not limited to its failure to provide adequate warnings, and its continued manufacture, sale, and marketing of the Product, which it knew was dangerous, evidences intentional disregard for the rights of Plaintiff and warrant the imposition of punitive damages.

## COUNT VI

### FRAUDULENT MISREPRESENTATION/CONCEALMENT
### (Brought on Behalf of Plaintiff Rodriguez Individually)

133.    Plaintiff realleges and incorporate herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein.

134.    A claim for fraudulent misrepresentation requires a plaintiff to allege "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury" *Mandarin Trading Ltd. v. Wildenstein*, 2011 NY Slip Op 741, ¶ 3, 16 N.Y.3d 173, 178, 919 N.Y.S.2d 465, 469, 944 N.E.2d 1104, 1108 (quoting Lama Holding Co. v Smith Barney Inc., 88 NY2d 413, 421, 668 NE2d 1370, 646 NYS2d 76 [1996]).

135.    Element #1 is satisfied because Mead Johnson falsely represented to Plaintiff and the public that Enfamil is, *inter alia*, "gentle nutrition tailored for infants" and "tailored to meet the nutritional needs of babies aged 0 through 12 months" when it knew these representations to be false.    A product that was truly tailored to infants' nutritional needs would not be manufactured without appropriate safety precautions.

136.    Element #1 is also satisfied because Defendant failed to disclose, while having a duty to disclose, that its manufacturing process was not subject to appropriate safety measures.

137.    Element #2 is satisfied because these and other similar representations were made for the purpose of inducing the reliance of Plaintiff.  Obviously, any mother would care a great deal about whether infant formula was truly suitable for infants.

138.    Element #3 is satisfied because Plaintiff Rodriguez's reliance on these representations was justified.  She had no way of discovering that they were not true.

139.    Element #4 is satisfied because Plaintiff Rodriguez suffered injury as a result of her daughter's hospitalization.

140.    As a result of the foregoing acts and omissions, Plaintiff incurred medical, health, incidental, and related expenses.

141.    Defendant's conduct as described herein, including but not limited to its failure to provide adequate warnings, and its continued manufacture, sale, and marketing of the Product, which it knew was dangerous, evidences intentional disregard for the rights of Plaintiff and warrant the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

A. An order requiring complete and immediate disclosure of all studies, reports, analyses, data, compilations, and other similar information within the possession, custody, or control of Mead Johnson concerning, relating to, or involving the health and safety of Enfamil products;

B.    An order barring Mead Johnson from destroying or removing any computer or similar records which record evidence related to the purported health and safety of Mead Johnson products;

C.    An order awarding compensatory damages in the amount to be determined for all injuries and damages described herein;

D.    An order awarding punitive damages to the extent allowable by law, in an amount to be proven at trial;

E.    An order awarding restitution and disgorgement of Mead Johnson's revenues from Plaintiff and the Class;

F.    An order awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Mead Johnson from continuing the unlawful practices as set forth herein, and directing Mead Johnson to identify, with Court supervision, other victims of its conduct and provide them with restitution and disgorgement of all monies acquired by means of unlawful conduct;

G.    An order compelling Mead Johnson to engage in a corrective advertising campaign;

H.    Attorney fees and costs; and

I.    Such other relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demand a jury trial on all claims so triable.


Dated: April 6, 2017

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**

By: _____ /s/ *C.K. Lee* _____
         C.K. Lee, Esq.

C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Telephone: (212) 465-1188
Facsimile: (212) 465-1181
*Attorneys for Plaintiff and the Class*

34